IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

SALAH SHAKIR,

     Plaintiff,

v.

BOARD OF TRUSTEES OF
REND LAKE COLLEGE, et al.,

     Defendants.                                        Case No. 08-cv-768-DRH

## MEMORANDUM & ORDER

HERNDON, Chief Judge:

### I.  Introduction

Before the Court is a Motion for Summary Judgment and supporting memorandum (Docs. 71 & 72), filed by defendants Board of Trustees of Rend Lake College, County of Jefferson, State of Illinois (the "College"), Bill Simpson, Randall Crocker and Bryan Drew.  Also before the Court is a Motion for Summary Judgment and supporting memorandum (Docs. 74 & 75), filed separately by defendant John Huffman.  Plaintiff has filed opposing Responses to each summary judgment motion (Docs. 80 & 81, respectively), to which Defendants have filed their Replies (Docs. 88 & 89).

Plaintiff has filed an employment discrimination suit, specifically

alleging discrimination based on his race, religion and/or national origin.  Stemming from this alleged discrimination, Plaintiff also seeks relief for retaliation, violations of his equal protection and due process rights, tortious interference with a prospective economic advantage and intentional infliction of emotional distress. Plaintiff claims that in response to an anonymous letter, the College launched an investigation, unfairly making Plaintiff the target due to discriminatory attitudes against his Muslim religion and Iraqi nationality.  Plaintiff believes that Defendants' reasons for conducting the investigation, freezing his salary and removing him as the Vice President of Student Services at the College were pretextual.  He claims that aside from the severe emotional distress he has suffered due to Defendants' actions, they have also significantly impaired his chances for future career advancement with either the College or other employers.

Defendants seek summary judgment on Plaintiff's suit in its entirety.[1] The Court has reviewed the Parties' briefings and relevant exhibits established on the record so that it may present its fully informed opinion herein regarding the merits of whether Defendants are entitled to summary judgment.

---

[1]  As stated, Huffman has filed his own summary judgment motion, as the only count remaining against him is Plaintiff's Count 5 for intentional infliction of emotional distress.  Because the Court must also analyze whether summary judgment on this Count should be granted as to the other Defendants, it will determine both summary judgment motions in this single Order.

## II.  <u>Background</u>

Previously, the Court recognized a Stipulation of Dismissal (Doc. 67), whereby Plaintiff dismissed with prejudice Counts 2, 4 and 6 of his Amended Complaint against defendant Huffman only (Doc. 91).  The Court also denied a Motion to Dismiss/Motion to Strike (Doc. 46), filed by the College, Simpson, Crocker and Drew, with the exception of Count 6, which Plaintiff, in his Response (Doc. 53), agreed should be dismissed with prejudice.  Thus, the remainder of Plaintiff's Amended Complaint (Doc. 37) still pending is as follows:

Count 1 -    a claim under Title VII for racial, religious and national origin discrimination and retaliation against the College;

Count 2 -    a racial discrimination claim against the College, Simpson, Crocker and Drew, pursuant to **42 U.S.C. § 1981**;

Count 3 -    a claim for violations of equal protection an due process rights against the College pursuant to **42 U.S.C. § 1983**;

Count 4 -    a claim for tortious interference with a prospective contractual relationship against Simpson, Crocker and Drew; and

Count 5 -    a claim for intentional infliction of emotional distress against the College, Simpson, Crocker, Drew and Huffman.

### III.  <u>Statement of Uncontested Facts</u>[2]

Currently, plaintiff Salah Shakir is employed by the College as its Vice President of Information Technology (Doc. 37, ¶¶ 1 & 14).  He has seventeen years of college-level administrative and teaching experience and overall, twenty five years of experience in the field of information technology (*Id*. at ¶ 1).  Plaintiff is a Muslim individual of Iraqi national origin (*Id*.).  The College is an employer within the meaning of **42 U.S.C. § 2000e**.  At the time at issue in this suit, defendant Bill Simpson ("Simpson") served as the Chairman of the College's Board of Trustees (the "Board") (*Id*. at ¶ 9).  Defendants Randall Crocker ("Crocker") and Bryan Drew ("Drew") were also members of the Board (*Id*. at ¶¶ 10-11).  Also at the time at issue in this suit, defendant John Huffman ("Huffman"), a private attorney, served as legal counsel for the College on a variety of matters (*Id*. at ¶ 12).

Sometime in August 2007, the Board received an anonymous letter (the

---

[2]  In their Replies (Docs. 88 & 89), Defendants make a variety of objections regarding evidentiary items relied upon by Plaintiff in his Responses.  In particular, Defendants argue that certain paragraphs in the affidavits of both Plaintiff and Mark Kern are inconsistent with their deposition testimony and that these cited portions of the affidavits should therefore be stricken or disregarded.  Further, Defendants object to certain documentary evidence relied upon by Plaintiff, arguing that the documents consist of hearsay and/or lack foundation from the alleged authors required to make them admissible.

Regarding the objections to the affidavits, the Court finds the cited deposition testimony does not, in fact, conflict with statements in the affidavits and therefore, these objections (*see* Doc. 88, pp. 1-2) are overruled.  However, the court sustains Defendants' objections that some of the affidavit portions consist of hearsay, lack foundation/speculation or are irrelevant, and as such, the Court will not rely upon Plaintiff's evidence it finds either to be hearsay, lacks foundation/speculation or to be irrelevant.  This holds true for Plaintiff's documentary evidence which the Court deems to be hearsay, lacks foundation/speculation or irrelevant.

In short, because the particular objections are too numerous to list each herein (and because Defendants chose to lump them in their Reply instead of a separate motion to strike), if a particular document or affidavit statement is cited herein and relied upon by the Court, the Parties may assume any objection thereto, if made, was overruled.

"letter"), dated August 20. 2007, which accused Plaintiff of acting unethically and questioned alleged misconduct by Plaintiff, Mark Kern ("Kern"), who was President of the College at the time, and his wife, Pat Kern, who was chief executive officer of the College foundation (Doc. 75, p. 2; Doc. 81, p. 2). Regarding Plaintiff specifically, the letter accused him of: (1) practicing his Muslim religion on school time; (2) speaking in Arabic on the phone and allowing foreign students to gather in front of his office; (3) hiring a non-English speaking computer programmer who required tax payer money to pay for his interpreter and to secure his work visa; and (4) attempting to bend the rules to allow two or more foreign citizens to enroll at the College as full-time students in order to extend their stay in the United States (*Id*.).

In early September 2007, Simpson, as Chairman of the Board of Trustees, requested that Drew and Huffman conduct an investigation regarding the letter and report their findings back to the Board (Doc. 75, p. 2; Doc. 81, pp. 4-5). The purpose of the investigation was to attempt to identify the letter's author, to uncover the facts regarding alleged circumstances relating to the admission of certain international students to the College, and any other matters that came up during the course of the investigation which Huffman and Drew thought should be reported to the Board (*Id*.). Proceeding with their investigation, Huffman and Drew began by interviewing approximately 35 College employees (Doc. 75, p. 3; Doc. 81, p. 5). Also during the later part of September 2007, the College received a second anonymous letter, again identifying Plaintiff, Mark Kern and Pat Kern as persons allegedly engaging in misconduct at the College (Doc. 75, p. 3; Doc. 81, p. 3).

Eventually, Plaintiff – his job performance and behavior – seemed to become the main focus of the investigation (Doc. 75, pp. 2-5; Doc. 81, pp. 2-9). Huffman met with Plaintiff regarding the investigation on two separate occasions: sometime in late September 2007 and again on October 3, 2007 (Doc. 75, p. 4; Doc. 81, p. 4). The first meeting was to briefly discuss Plaintiff's upcoming formal interview, to occur on October 3rd. Huffman informed Plaintiff about some of the general topics he anticipated he would ask Plaintiff to address during his formal interview. Additionally, Huffman was interested in discussing with Plaintiff who he thought had authored the anonymous letters (Doc. 81, p. 4 - citing Doc. 75, attached Huffman Aff., ¶ 12). Huffman and Drew formally interviewed Plaintiff on October 3, 2007, as part of their investigation. The interview was reported by a court reporter (Doc. 75, p. 4, attached Huffman Aff., ¶ 13, Ex. 4 - transcript of interview).

At the conclusion of the investigation, Huffman met with the Board to report the findings. Ultimately, on October 19, 2007, the Board approved removing Plaintiff from his position as the Vice President of Student Services (he remains the Vice President of Information Technology) (Doc. 75, p. 6; Doc. 37, ¶ 34). At some point in time thereafter, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") (Doc. 37, ¶ 41; Doc. 72, p. 7).

Sometime thereafter, Mark Kern deciding to retire from President of the College and so the College began taking applications and conducting interviews for the College President position. Plaintiff applied; he was interviewed but was not offered the job (Doc. 37, ¶¶ 47, 50; Doc. 72, pp. 7-8).

## IV.  <u>Summary Judgment</u>

Summary judgment is proper where the pleadings and affidavits, if any, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." **FED. R. CIV. P. 56(c);** *Oats v. Discovery Zone*, **116 F.3d 1161, 1165 (7th Cir. 1997) (citing** *Celotex Corp. v. Catrett*, **477 U.S. 317, 322 (1986))**.  The movant bears the burden of establishing the absence of fact issues and entitlement to judgment as a matter of law.  *Santaella v. Metro. Life Ins. Co.*, **123 F.3d 456, 461 (7th Cir. 1997) (citing** *Celotex*, **477 U.S. at 323)**.  This Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant.  *Regensburger v. China Adoption Consultants, Ltd.*, **138 F.3d 1201, 1205 (7th Cir. 1998) (citing** *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 255 (1986));** *see also Smith v. Hope School*, **560 F.3d 694, (7th Cir. 2009) ("[W]e are not required to draw every conceivable inference from the record . . . we draw only reasonable inferences.") (citations omitted)**.  Summary judgment is also appropriate if a plaintiff cannot make a showing of an essential element of his claim.  *Celotex*, **477 U.S. at 322**.  While the Court may not "weigh evidence or engage in fact-finding" it must determine if a genuine issue remains for trial.  *See Lewis v. City of Chicago*, **496 F.3d 645, 651 (7th Cir. 2007)**.

In response to a motion for summary judgment, the non-movant may not simply rest on the allegations in his pleadings; rather, he must show through

specific evidence that an issue of fact remains on matters for which he bears the burden of proof at trial. ***Walker v. Shansky*, 28 F.3d 666, 670-71 (7th Cir. 1994), *aff'd*, 51 F.3d 276 (citing *Celotex*, 477 U.S. at 324)**. No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." ***Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994)**.  In other words, "inferences relying on mere speculation or conjecture will not suffice." ***Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009) (citation omitted); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant].")**.  Instead, the non-moving party must present "definite, competent evidence to rebut the [summary judgment] motion.***" EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (citation omitted)**.

## V. <u>Discussion</u>

### A.    Racial, Religious and National Origin Discrimination

Plaintiff brings a cause of action in Count 1 against the College for violation of Title VII, alleging that the College discriminated against him because of his race, religion and national origin, as well as retaliated against him for filing a complaint with the EEOC (Doc. 37, ¶¶ 57-61; Doc. 72, p. 3).  Plaintiff also brings a cause of action for discrimination in Count 2, pursuant to **42 U.S.C. § 1981**.

Title VII, **42 U.S.C. § 2000e**, declares it unlawful for an employer to discharge or otherwise discriminate against "any individual" in the terms or conditions of employment "because of such individual's race, color, religion, sex, or national origin."  **42 U.S.C. § 2000e-2(a)(1)**.  "A plaintiff may meet his burden of proof under Title VII by offering either direct proof of discriminatory intent or by proving disparate treatment through the indirect, burden-shifting method outlined by the Supreme Court in ***McDonnell Douglas***."  ***Contreras v. Suncast Corp.***, **237 F.3d 756, 759 (7th Cir. 2001) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973))**.

The Seventh Circuit has discussed how the terms "direct" and "indirect" can be somewhat misleading in the context of proving employment discrimination, given that the distinction between these "two avenues of proof is 'vague.' "  ***See Hemsworth, v. Quotesmith.com, Inc.***, **476 F.3d 487, (7th Cir. 2007) (quoting *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir.**

2006)).  Although direct proof of discrimination may certainly be demonstrated by a defendant's actual admission of discrimination, the direct method of proof is not limited to only this type of evidence.  Additionally, a plaintiff may show direct evidence of discrimination through sufficient circumstantial evidence suggesting discrimination.  ***Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 695 (7th Cir. 2006); *see also Cerutti v. BASF Corp.*, 349 F.3d 1055, 1063 (7th Cir. 2003) (chain of inferences must collectively form "a convincing mosaic of circumstantial evidence" in order to show intentional discrimination under the direct method of proof) (citation omitted)**.  However, the circumstantial evidence must point directly to a discriminatory reason for the [adverse employment] decision." ***Id.* (citing *Cerutti*, 349 F.3d at 1063)**.

Generally, circumstantial evidence can be grouped into three categories, each of which may be sufficient on its own to show direct evidence of discrimination:

    (1)    suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group;

    (2)    evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and

    (3)    evidence where the employee was qualified for and failed to receive the desired treatment, and the employer's stated reason for the difference is unworthy of belief.

***Hasan v. Foley & Lardner, LLP*, 552 F.3d 520, 530 n.4 (7th Cir. 2009) (citations and quotations omitted)**.

Establishing discrimination using the indirect burden-shifting method,

as set forth by the Supreme Court in *McDonnell Douglas*, the plaintiff must establish a *prima facie* case that: (1) he was a member of a protected class, (2) he was performing reasonably on the job in accordance with the employer's legitimate expectations, (3) despite his reasonable performance, he suffered an adverse employment action, and (4) similarly situated employees outside of the plaintiff's protected class were treated more favorably.  **See Ptasznik, 464 F.3d at 696 (citing *McDonnell Douglas*, 411 U.S. at 802) (other citation omitted).**  If the plaintiff can establish a *prima facie* case, then the burden shifts to the moving defendants to rebut it by articulating a legitimate, nondiscriminatory reason for the adverse employment action.  ***Id.* (explaining even though a plaintiff may show the adverse employment action "was motivated in part by discrimination, the defendants may avoid liability by demonstrating that they would have made the same decision despite the alleged unlawful motive") (citations omitted).**  Once a legitimate and nondiscriminatory reason has been shown, the burden then shifts back to the plaintiff to show that the defendants' reason for the adverse employment action was merely pretextual.  ***Id.* (observing that a pretextual reason is one that is dishonest rather than one that is merely inaccurate, unwise or ill-considered) (citations omitted).**

1.   **Count 1**

     a.   **Discrimination**

In their summary judgment motion, defendants Simpson, Crocker, Drew and the College (hereinafter "Defendants") argue that Plaintiff cannot show discrimination as required in Count 1 of his Amended Complaint. Defendants recite the law describing the direct and indirect methods of proving discrimination, and state that if direct evidence of discriminatory intent is not available, a plaintiff may proceed by using the burden-shifting method (Doc. 72, pp. 3-4). Continuing, Defendants develop an analysis advocating their position that Plaintiff cannot sufficiently show proof of discriminatory intent through the indirect burden-shifting method. In short, Defendants state the decision was made to remove one of Plaintiff's VP titles because the investigation revealed he was not performing his job duties in a satisfactory manner (Doc. 72, p. 5). In particular, Defendants list their reasons as: (1) Plaintiff violated the College's policies and procedures; (2) employees supervised by Plaintiff claimed they were afraid of him; (3) Plaintiff either falsified an I-20 form for a foreign student or aided another employee in doing so; (4) Plaintiff violated College policy by lowering admission standards to admit certain foreign students; (5) Plaintiff confronted another vice president, yelled and threatened him and called his female employees "bitches"; (6) a female employee had made allegations of sexual misconduct against Plaintiff; and (7) Plaintiff was improperly monitoring e-mails of other College employees (*Id.*).

In response, Plaintiff first argues he can prove discriminatory intent

though the direct method and suggests that Defendants have waived this argument because they failed to specifically address it in their summary judgment motion; Defendants merely offer an analysis regarding the indirect method (Doc. 80, p. 2). Contrary to Plaintiff's suggestion, the Court notes Defendant's assertion that Plaintiff "has acknowledged and the evidence is undisputed that he cannot show any direct evidence of discrimination" (Doc. 72, p. 4).  Thus, the Court construes Defendants' argument as one which asserts that because Plaintiff cannot prove discrimination through the direct method, the indirect method is the only other means by which he may attempt to do so.  The fact that Defendants do not include a more fully-developed analysis under the direct method simply means they have missed an opportunity to raise particular arguments against Plaintiff's proffered "direct" evidence for the Court's consideration herein (except for the argument in their Reply).  Nevertheless, Defendants seek summary judgment because of their assertion that Plaintiff cannot show their discriminatory intent motivated the adverse employment decision.  This implies Plaintiff's evidence is insufficient under either method and thus, the Court must look to whether Plaintiff can offer evidence creating an existing issue of material fact of discrimination, under both the direct and indirect methods.

### i.   Direct Method

Applying the direct method, Plaintiff offers the following circumstantial evidence, that he believes, when taken as a whole, directly points to Defendants' discriminatory motive or reveals a discriminatory atmosphere at the College (Doc.

80, pp. 3-5):[3]

1.   Defendants authorized an investigation regarding Plaintiff in response to the anonymous letter, which Plaintiff characterizes as "very racist" (*Id*. at 3, citing Ex. 21 at RLC 8-9; Ex. 1 - Plf's Aff. at ¶ 1; Ex. 19 - Simpson Dep. at 133).

2.   Defendants failed to publicly repute the letter, even though facts about its content were made public to local media (*Id*.).

3.   Plaintiff claims the investigation was "extensive" and led to Defendants' decision to remove him "prematurely" from one of his vice presidencies and freeze his salary (*Id*., citing Ex. 9 - Drew Dep. at 59; Ex. 14 - Mark Kern Dep. at 108, 257).

4.   Plaintiff claims Defendants unfairly alerted security when they learned that there were three Saudi Arabian students on campus, and a College employee, Lindsay Darnell, requested extra security at the campus daycare center because of her fear of the Saudi students (*Id*. at 3-4, citing Ex. 21 at RLC 141; Ex. 14 - Mark Kern Dep. at 153-54; Ex. 19 - Simpson Dep. at 103, 122-25, 132-33; Ex. 8 - Darnell Dep. at 125-27).

5.   Plaintiff claims Defendants were upset due to their belief that Plaintiff had admitted these three students to attend the College despite the fact that their Test of English as a Foreign Language ("TOEFL") scores did not meet the mandatory minimum (*Id*., citing Ex. 14 - Mark Kern Dep. at 153-54; Ex. Ex. 19 - Simpson Dep. at 22-25, 132-33).

6.   Upon voting to freeze Plaintiff's salary, Plaintiff claims defendant Crocker said that the Board had not punished Plaintiff enough (*Id*. at 4, citing Ex. 14 - Mark Kern Dep. at 239).

7.   Plaintiff claims the College appeared to have a "strikingly high amount of contact" with federal government officials about routine issues whenever Arab and/or Muslims were involved (*Id*., citing Ex. 8 - Darnell Dep. at 119-20).

---

[3]  Any of the circumstantial evidence Plaintiff lists as "direct evidence" of Defendants' discriminatory intent (*see* Doc. 80, pp. 2-5) which is not mentioned in the Court's analysis, has been intentionally omitted because the Court finds that the cited proffered exhibits lack foundation (e.g., Plaintiff cites to "RLC's" which are a series of documents provided by Defendants through document production, some of which are unidentified transcripts from deposition and thus, the identify of the deponent is unclear; or these cited RLC's are letters that have no corresponding affidavit from the author or records custodian to authenticate).  However, the Court *has* included several of items comprising Plaintiff's circumstantial evidence that appear to be unsupported by the cited exhibits, which the Court will address in turn.

8.  Plaintiff claims Crocker was aware that a College employee had contacted the Department of Homeland Security about Plaintiff, but refused to reveal the employee's identity to Mark Kern, the College President (*Id.*, citing Ex. 14 - Mark Kern Dep. at 168-69).

9.  Plaintiff also claims that Lindsay Darnell, the College Registrar ,was in contact with the FBI about Plaintiff and publicized this fact widely (*Id.*, citing Ex. 14 - Mark Kern Dep. at 169-70; Ex. 8 - Darnell Dep. at 112).

10.  The College did not employ any foreign-born or other persons of minority as top administrators other than Plaintiff since he and Crocker had worked there (*Id.*, citing Ex. 7 - Crocker Dep. at 23-25; Ex. 1 - Plf's Aff. at ¶ 6).

11.  Further, Plaintiff claims the Board failed to follow its normal policy and procedure when it refused to allow their College President, Mark Kern, to attend executive sessions of the Board in which his own employment was not at issue (*Id.* at 5, citing Ex. 14 - Mark Kern Dep. at 237, 241-42). Moreover, Plaintiff claims Simpson met with College administrators without first informing Kern, as president, also in violation of Board policy (*Id.*, citing Ex. 14 - Mark Kern Dep. at 243). Finally, Plaintiff claims that Simpson unilaterally authorized the investigation of Plaintiff in violation of Board policy (*Id.*, citing Ex. 2 - Mark Kern Aff. at ¶ 6; Ex. 21 at RLC 756).

Clearly, Plaintiff is attempting to show a type of circumstantial evidence categorized by the Seventh Circuit as "suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group," given that he presents no statistical facts regarding similarly situated employees being treated more favorably nor does he present facts in his argument that he was qualified to receive the desired treatment from his employer, but was refused.[4] ***See Hasan*, 552 F.3d at 530 n.4**. However, much of the

---

[4] The Court observes the that Plaintiff fails to present, as part of his argument supporting the "direct" method, that he was unjustly denied the position of College President even though he believed he was the most qualified candidate. "In considering a motion for summary judgment, the district court is not required to scour the record in search of evidence to defeat the motion; the nonmoving party must identify with reasonable particularity the evidence upon which the party relies." **Hemsworth, 476 F.3d at 490 (citation omitted)**. Thus, the Court does not include it as

evidence Plaintiff cites does not actually support his claims.  The Court will address

the evidentiary deficiencies in the same corresponding numerical order as Plaintiff's

"circumstantial evidence," *supra*.

3.    The cited pages from the deposition testimony of Mark Kern do not
conclusively state that Defendants' placed a freeze upon Plaintiff's salary.
Rather, the transcript reveals (when discussing the minutes of the Board
meeting):

> Q:    When I look at the vote on that change of Mr. Shakir's position,
> there's no reference in there to freezing his salary.  Are you aware
> of the different vote that the board of trustees took with respect
> to Mr. Shakir's salary?
>
> A:    No, I'm not.  I assume they did, but I'm not – I've not – I can't tell
> you where it is.

(Doc. 83, Ex. 14 - Kern Dep. at 256-57:3-9.)

4.    Plaintiff cites RLC 141, which is an unidentified transcript excerpt so the
Court disregards it due to its lack of foundation.  The cited Darnell deposition
transcript excerpts indicate that Darnell's *father* was the one who actually
contacted campus for extra security at the daycare center, not Darnell herself.
Further, she claimed it that her father's concern stemmed from Darnell's
alleged public verbal assault by Pat Kern, although she admitted he had
concerns due to the others "involved" such as Mark Kern, Plaintiff and the
Saudi Arabian students (Doc. 83, Ex. 8, 125:9-127:10).  There is, however, no
evidence to support Plaintiff's assertion that Defendants alerted security due
to the presence of the Saudi Arabian students on campus.

7.    The cited deposition transcript excerpts only indicate that one employee,
Lindsay Darnell, was initially contacted by FBI agents and likely
communicated with them a total of about five or six times, but there is nothing
which further supports Plaintiff's claim that this contact was made when
dealing with "routine issues" involving Arabs and/or Muslim employees or
students.

9.    Nothing in the cited deposition testimony excerpts indicates that Darnell

---

part of its analysis.

specifically discussed Plaintiff with FBI agents.

10.   Plaintiff fails to offer any evidence showing that either foreign-born or minority applicants had applied for top administrative positions within the College and that the College declined to offer these candidates the job.

11.   The cited deposition testimony excerpts do not conclusively establish the claimed violation of Board policy and procedure.  Plaintiff neither cites nor attaches a copy of the policy or procedural provision(s) which he claims Defendants violated.  Further, Plaintiff cites to Ex. 21, RLC 756, which is not included as part of Ex. 21.

Viewed collectively, the inferences to be drawn from Plaintiff's well-supported circumstantial evidence do not point directly to a discriminatory reason behind Defendants' decision to remove Plaintiff as Vice President of Student Services and freeze his salary.[5]   Therefore, the Court finds Plaintiff has not shown discriminatory intent on the part of Defendants in their decision to remove Plaintiff as Vice President of Student Services under the direct method.

### ii.    Indirect Method

Defendants do not contest the fact that Plaintiff is a member of a protected class or that he suffered an adverse employment action, but assert that he cannot meet the second and fourth prongs of the indirect burden-shifting test under **McDonnell Douglas** to make a *prima facie* case of discrimination (Doc. 72, pp. 3-6).  Further, even if Plaintiff make his *prima facie* case, Defendants believe they can offer a legitimate, nondiscriminatory reason for their actions, that is not pretextual

---

[5]  The Court notes that Defendants argue that Plaintiff's salary was never frozen (Doc. 88, 3).  It appears this fact is in dispute, but, as can be seen from the Court's analysis, is not material for summary judgment purposes as to Count 1.

Page 17 of 33

(*Id*. at 6).  Plaintiff, in response, argues that he can make his *prima facie* case under the indirect method and that any reasons Defendants offer for their actions are, in fact, pretextual (Doc. 80, pp. 6-12).

Regarding Plaintiff's job performance, Defendants assert that he was not performing his job satisfactorily.  Defendants claim Plaintiff either acknowledged or the Board discovered the following during their investigation of Plaintiff: (1) Plaintiff had violated the College's policies and procedures; (2) employees supervised by Plaintiff had claimed they were afraid of him; (3) Plaintiff either falsified an I-20 form for a foreign student or aided another employee in doing so; (4) Plaintiff violated College policy by lowering admission standards to admit certain foreign students; (5) Plaintiff confronted another vice president, yelled and threatened him and called his female employees "bitches"; (6) a female employee had made allegations of sexual misconduct against Plaintiff; and (7) Plaintiff was improperly monitoring e-mails of other College employees (Doc. 72, p. 5).

Moreover, Defendants argue Plaintiff cannot identify any similarly situated individual treated more favorably than he was.  Defendants note Plaintiff's claim that when the College received an anonymous letter concerning Vice President of Instruction Jim Hull, who Plaintiff asserts is a similarly situated employee, the Board refrained from launching an investigation (*Id*.).  Defendants argue that the allegations in the anonymous letter regarding Mr. Hull were "materially different" than the letter regarding Plaintiff in that it did not contain accusations that Mr. Hull was violating any of the College's policies or procedures (*Id*. at 6).  Again, Defendants

argue that even if Plaintiff shows that Hull was a similarly situated employee treated more favorably, they can meet their burden of showing a legitimate, nondiscriminatory reason for their actions.  They approved removing Plaintiff from the position of VP of Student Services based upon the recommendation by Mark Kern and also on the noted problems with Plaintiff's job performance, as previously described (*Id*. at 6-7).

Plaintiff argues that the evidence disputes Defendants' assertion that he was not performing his job satisfactorily (Doc. 80, pp. 8-10).  He also argues that similarly situated employees outside of the protected class were treated more favorably.  Plaintiff offers Mr. Jim Hull as a comparison.  Hull was also a Vice President at the College (but not a member of a protected class).  The College received two anonymous letters regarding Hull, but never launched an investigation regarding those letters.  The College maintains that because the letters never included allegations regarding violations of Board policies or procedures, an investigation was unnecessary.  Either way, the Court observes that the record shows Mr. Hull chose to leave the College of his own accord and so the need for an investigation was therefore moot (Doc. 72, Ex. 6 - Mark Kern Dep., 226:11-25).  Furthermore, the Court does not construe an employer's act of conducting an investigation regarding one of its employees, as "unfavorable treatment."  Therefore, the fact that there were no investigations conducted in response to the anonymous letters concerning Hull does not indicate Plaintiff was treated less favorably.  Hull chose to obtain different employment, whereas Plaintiff continues to be employed by

the College.  There is not a sufficient means of comparing the two for the purposes of a "similarly situated" employee analysis.

Plaintiff also argues that he was treated differently than Bob Carlock, another Vice President of the College, and Pat Kern, who was also subject of the anonymous letter that discussed Plaintiff.  Plaintiff argues that a former College employee filed and won a discrimination lawsuit in which Carlock was implicated but that the College never demoted or investigated him (Doc. 80, pp. 9-10).  Further, Plaintiff argues that the anonymous accusing Plaintiff of misconduct also accused Pat Kern of various misconduct, but that the investigation never focused on her nor was she demoted.  In addition, Plaintiff states that Pat Kern was accused of physically assaulting a College employee, but again, she was never demoted despite the fact that she was subject to the College's policies and procedures as CEO of the College Foundation (*Id*.).

Regarding Carlock, the record does not indicate that there was any wrongdoing on his part (Doc. 83, Ex. 6 - Carlock Dep., 20-30).  As far as Pat Kern, as CEO of the College Foundation, the Court is unsure whether she would be "similarly situated," but *assuming arguendo* that she was, it finds that she was treated more favorably in that she did not become a focus of the investigation, even though the letter (and College employees) accused her of misconduct, nor does it seem that the College took any adverse actions against her.  Thus, the Court will resolve these factual disputes in favor of Plaintiff as the non-movant, and find that Plaintiff has shown a *prima facie* case under the indirect method.  As such, the

burden now shifts to Defendants to offer a legitimate, nondiscriminatory reason for removing Plaintiff from his position as the VP of Student Services.

Defendants state their reasons were because of Plaintiff's problems with his job performance, as discussed *supra*, as well as based upon the recommendation of the College President, Mark Kern (Doc. 72, pp. 6-7).  Again, Plaintiff argues this reason was pretextual and that Mark Kern only recommended the course of action as a means of preventing the Board from terminating Plaintiff's employment altogether.  Plaintiff also contests Defendants' assertion that his job performance was a problem (Doc. 80, pp. 7-10).  Considering Plaintiff's argument, the Court finds that although some of the details regarding Defendants' observations of Plaintiff's job performance may differ from Plaintiff's interpretation, the fact remains that: (1) during the investigation certain College employees complained of fearing Plaintiff, regardless of the actual number of complaints made; (2) Plaintiff participated in the issuance of an I-20 form for an international College student while the Registrar was away on vacation and later, the Registrar complained that her signature/approval of the I-20 was not authorized (whether Plaintiff actually knew the Registrar did not grant her approval does not alter the fact that he assisted with the issuance of the I-20); (3) Plaintiff allowed certain international students to be admitted to the College who did not meet the stated minimum TOFEL scores required by the College, regardless of whether an "informal exception" had been applied in the past; (5) a female College employee stated that Plaintiff had placed her in an uncomfortable situation when he rubbed her shoulders during a College event; and (6) Plaintiff was

monitoring the e-mails of College employees in order to find out information about the author of the anonymous letter until he was asked to stop.

The Court therefore finds that Defendants' reason for accepting the recommendation of Mark Kern, as College President, to remove Plaintiff as the VP of Student Services was not pretextual.  Further, as the Seventh Circuit stated in *Ptasznik*:

> [W]e are not condoning the alleged actions of [the plaintiff's] employer. Arguably, the [employer] overreacted and unnecessarily fired an employee with an otherwise competent performance record. Nevertheless, it is not our role to determine the competency of or interfere in employment decisions simply where we believe an employer has made a poor choice.  Federal courts have authority to correct an adverse employment action only where the employer's decision is unlawful, and not merely when the adverse action is unwise or even unfair.  "We do not sit as a super-personnel department with authority to review an employer's business decision as to whether someone should be fired or disciplined because of a work-rule violation." . . . Therefore, our inquiry is limited to whether there is a material factual dispute as to whether the employer honestly believed the stated, legitimate reasons for the adverse action.  Unfortunately for [the plaintiff], [the] evidence is insufficient for a jury to reasonable conclude that an impermissible factor such as age or national origin motivated the [employer's] decision to terminate [the plaintiff].

*Ptasznik*, 464 F.3d at 697 (quoting *Ballance v. City of Springfield*, 424 F.3d 614, 621 (7th Cir. 2005)).

Acting upon the rationale provided by the Seventh Circuit in *Ptasznik*, the Court also must refrain from looking past whether the decision to remove Plaintiff as VP of Student Services made credible business sense or was even fair, but instead must only look to whether it was unlawful.  Here, the Court finds no issue of material fact to question whether Defendants' actions were anything but legitimate

and nondiscriminatory.  In other words, the evidence Plaintiff submits does not signify pretext.  As such, Plaintiff cannot meet his burden of showing discrimination under either the direct or indirect method.

> **b.    Retaliation**

In Count 1, Plaintiff also alleges that the College retaliated against him for complaining about discrimination and for filing a complaint with the EEOC. Defendants argue that this cause of action must also fail as a matter of law (Doc. 72, pp. 7-8).  Again, Plaintiff may establish a *prima facie* case for unlawful retaliation by either a direct or indirect method.  First, direct evidence of retaliation requires Plaintiff to show that as a proximate result of his complaining about discrimination or filing his EEOC complaint, he was removed as VP of Student Services.  ***See Sylvester*, 453 F.3d at 902 (7th Cir. 2009) (citations omitted)**.  Indirect evidence of retaliation requires the same method of establishing a *prima facie* case as the ***McDonnell Douglas*** method: Plaintiff must show after complaining about discrimination and/or filing his EEOC complaint, only he, and not any similarly situated employee who did not complaint, was subject to an adverse employment action even though he was performing his job in a satisfactory manner.  ***Id.*** Normally, a plaintiff will use the direct method if there is no evidence of a similarly situated employee to offer.  ***Id.***

Plaintiff argues under the direct method that he was "denied" the president position just months after he filed his EEOC complaint, claiming he was

not even considered, even though he was very qualified (Doc. 80, pp. 5-6).  Moreover, Plaintiff claims one board member told Kern that if Plaintiff dropped his lawsuit, he could stay as long as he wanted; another said it would be better for Plaintiff to leave the College, and a third was said to be very upset with Plaintiff (*Id.*).   If Plaintiff produces evidence creating the inference of retaliation, Defendants must show unrebutted evidence that it would have taken the employment action against Plaintiff even if there was no opportunity for a retaliatory motive.   ***Antonetti v. Abbott Labs.*, 563 F.3d 587, 593 (7th Cir. 2009) (citation omitted)**.

Defendants argue that there were legitimate and nondiscriminatory reasons for not selecting Plaintiff for College President.  During the search process, Defendants state that none of the representatives from three to four different campus groups who interviewed Plaintiff recommended him (Doc. 72, p. 8).   Further, Defendants assert that the Board wanted "an external candidate with fresh ideas and they did not believe that [Plaintiff] was dynamic and qualified enough for the job'" (*Id.*).  Further according to Defendants, Plaintiff's poor job performance was also a factor in the decision not to offer him the position of College President (*Id.*).

The Court finds that Defendants' explanation rebuts the presumption of retaliation.  Further, failing to offer Plaintiff the job of College President does not completely qualify as an "adverse employment action" for the purposes of retaliation as Plaintiff had not been promised the job or was in any other way entitled to the position of College President.  Plaintiff has not offered evidence of a similarly situated employee for the Court to analyze the retaliation issue via the indirect method.  In

sum, the Court finds no existing issue of material fact supporting Plaintiff's claim for retaliatory discrimination.  Accordingly, the College is entitled to summary judgment as to Count 1 of Plaintiff's Amended Complaint in its entirety.

### 2.  Count 2

Count 2 of Plaintiff's Amended Complaint states a cause of action for discrimination under **42 U.S.C. § 1981** against Defendants.  Discrimination claims under Title VII as well as **§ 1981** "rise or fall together" as they both require a plaintiff to prove the same elements to make out a *prima facie* case.  **Antonetti, 563 F.3d at 591 n.4 (citing *Lalvani v. Cook County, Ill.,* 269 F.3d 785, 789 (7th Cir. 2001))**.  For the same reasons, therefore, that the College was entitled to summary judgment on Count 1, so is it entitled to summary judgment as to Count 2.

### 3.  Count 3

#### a.  Equal Protection

Plaintiff brings a cause of action against the College for violations of his equal protection and due process rights, pursuant to **42 U.S.C. § 1983**.  Defendants move for summary judgment on this Count, arguing that because the same standard applies here for equal protection violations as in showing discrimination under Title VII or **§ 1981**, his cause of action must fail (Doc. 72, p. 12).  The Court agrees.  **See, e.g., *Williams v. Seniff*, 342 F.3d 774, 778 n.14 (7th Cir. 2003)**.

**b.    Due Process**

Plaintiff complains Defendants failed to afford him his minimal due process rights before removing him as VP of Student Services and placing a freeze upon his salary, because they did not provide him with a prior opportunity to be heard at a meaningful time, in a meaningful manner (Doc. 80, p. 12).  Also, Plaintiff claims that because he was not informed about the specific violations he had allegedly committed, he had no way to properly file a grievance with the College afterwards, thereby taking advantage of any post-deprivation process.   Plaintiff believes that aside from his removal as VP of Student Services, the freeze he claims the College placed upon his salary amounted to a taking, both short and long-term, in that "he was set back by that amount for the rest of his career," although he may have the standard salary increases in subsequent years (Doc. 80, p. 14).  Plaintiff also argues that the denial of the offer for the position of College President caused him a loss of income, but this is not well-taken, as Plaintiff cannot show he had a property interest in this position to amount to a takings.

A cause of action for deprivation of a public employee's property interest in continued employment must be more than *de minimus*.  ***Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 530 (7th Cir. 2000) (citations omitted)**.   This excludes areas of employment such as dignitary or other nonpecuniary aspects of the job.  Instead, a plaintiff needs to show some "economic loss" or "an identifiable impact on future income or economic benefits." ***Id.* (citation**

omitted).  Although the Court does not see removing Plaintiff's title as VP of Student Services to be a deprivation of a property interest, given that he was kept at the same salary and that he remained employed as VP of Information Technology, his claim regarding the salary freeze will serve to potentially qualify as a takings.

Due process requires some type of hearing prior to the takings as well as some opportunity to respond.  *Cleveland Bd. of Educ. v. Loudermill*, **470 U.S. 532, 542 (1985)**.  The Court finds from the record that Plaintiff was given notice of the concerns of the Board when it was conducting its investigation via his two informal interviews with Huffman.  Plaintiff even wrote a memo responding to the allegations.  The Court finds the notice given by Huffman of the general allegations/topics of investigation and the means by which Plaintiff was allowed to respond, were sufficient process, especially in light of the fact that Plaintiff's employment overall was not actually terminated.  Thus, Defendants are entitled to summary judgment as to Count 3 in its entirety.

**B.     Statute of Limitations as to Counts 4 and 5**

Defendants argue that Counts 4 and 5 are barred by the applicable statute of limitations found in the Local Governmental and Governmental Employees Tort Immunity Act (the "Act"), **745 ILL. COMP. STAT. 10/8-101** (Doc. 72, pp. 15-16). This argument was considered and denied previously by the Court in its February 1, 2010 Order (Doc. 91) denying Defendants' Motion to Dismiss (Doc. 46).  Unlike at the prior stage, where the Court was required to construe all of Plaintiff's well-

plead, nonconclusory allegations as true, it liberally construed his Amended Complaint as alleging a continuing tort as a theory of liability.  The standard, as established above, is not the same when considering summary judgment motions. It is clear to the Court that this case does not involve alleged continuing harms but rather, in actuality, the allegation of different harms under the same or similar legal banner.  However, in light of the Court's ruling on the other issues at bar regarding Counts 4 and 5, discussed *infra*, there is no need.  As such, the Court declines reaching a decision on the statute of limitations question as applied to Plaintiff's allegations.

### C.    Governmental Immunity

As argued previously in their Motion to Dismiss (Doc. 46), Defendants assert that as to Counts 4 and 5, they are entitled to immunity under sections 2-201 and 2-109 of the Local Governmental and Governmental Employees Tort Immunity Act (the "Act"), which provides:

> Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused.

**745 Ill. Comp. Stat. 10/2-201**.  Additionally, under Section 2-109 of the Act, the local governmental entity cannot be liable where its employee is not found to be liable.  **745 Ill. Comp. Stat. 10/2-109**.

Defendants assert that all decisions involving Plaintiff, from the decision

Page 28 of 33

to investigate the accusations in the anonymous letter to the decision regarding his removal as VP of Student Services, were made by the Board Trustees vested with authority to do so.  In response, Plaintiff argues that Defendants acted outside of their scope of authority (Doc. 80, pp. 17-18).  The problem is neither side offers proof to show what authority Defendants actually possessed, so there is no way for the Court to determine, as a matter of law, whether immunity shields Defendants.

**D.     Count 4**

Defendants argue that Plaintiff cannot prevail on his claim to show their tortious interference with his prospective economic advantage because Plaintiff cannot claim that a corporate employer has interfered with its own business relationship with its own employees (Doc. 72, p. 17).  However, Plaintiff counters that the exception to this general rule is met when it is shown that a corporate agent acted solely for his or her own gain for solely for the purpose of harming the plaintiff, done without justification or maliciously (Doc. 80, pp. 18-19).  ***See Mittelman v. Witous*, 552 N.E.2d 973, 987 (Ill. 1989), *abrogated on other grounds, Kuwik v. Starmark Star Mktg. Admin., Inc.*, 619 N.E.2d 129, 133 (Ill. 1993)**.

Plaintiff claims Defendants acted maliciously and without justification, as demonstrated by evidence of various injurious comments made by Board members regarding Plaintiff (Doc. 80, p. 19).  However, the Court has already found, *supra*, that Defendants had legitimate and nondiscriminatory reasons both for removing him as VP of Student Services (which would include freezing his salary, if

that did, in fact happen – *see* note 5, *supra*), and for not selecting him for the position of College President.  Therefore, there remains no issue of material fact as to whether Defendants' alleged malicious and unjustified actions, such as the various comments allegedly made by Board members, interfered with Plaintiff's ability to maintain his position as VP of Student Services or his chances of being made president of the College.  Defendants are entitled to summary judgment as to Count 4 of Plaintiff's Amended Complaint.

**E.    Count 5**

In Count 5, Plaintiff brings a cause of action for intentional infliction of emotional distress ("IIED") against all defendants: the College, Simpson, Crocker, Drew and Huffman.[6]  Defendants all seek summary judgment on this Count as well. A cause of action for IIED requires a showing that (1) Defendants' conduct was extreme and outrageous; (2) Defendants either intended to inflict severe emotion distress upon Plaintiff or else knew that there was a high probability that their conduct would do so; and (3) Defendants' conduct actually caused Plaintiff severe emotional distress. **_Breneisen v. Motorola, Inc._, 512 F.3d 972, 983 (7th Cir. 2008) (citing _Feltmeier v. Feltmeier_, 798 N.E.2d 75, 80 (Ill. 2003).**  This tort will not encompass "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialites." **_Id._ (citing _McGrath v. Fahey_, 533 N.E.2d 806, 809 (Ill. 1988) (internal quotes omitted).**  Instead, to be deemed "outrageous,"

---

[6]  This portion of the Court's analysis will therefore also look to Huffman's Motion for Summary Judgment (Doc. 74) and the following response and reply thereto (Docs. 81 & 89).

Defendants' conduct must have been "so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." **Id.** **(citing** **McGrath, 533 N.E.2d at 83) (internal quotes omitted)**.

Based on the Court's previous findings herein, there is nothing on the record which leaves an existing issue of material fact signifying any type of behavior or actions taken by Defendants that could, under the definition provided by law, be construed as "outrageous." Rather, the College, as an employer, has the discretionary right to investigate allegations of misconduct regarding its employees. While such an investigation should not go beyond the realms of decency and turn into a proverbial "witch hunt," that was not the case here. Therefore, while the Court can certainly understand that the entire experience was not anywhere near pleasant for Plaintiff, and likely he did suffer emotional distress as a result, there is no question of material fact regarding whether Defendants intentionally inflicted it upon him. The Seventh Circuit has observed the fact that Illinois courts recognize "personality conflicts and questioning of job performance as 'unavoidable aspects of employment' and that 'frequently, they produce concern and distress . . . [yet] if such incidents were actionable, nearly all employees would have a cause of action for intentional infliction of emotional distress." **Van Stan v. Fancy Colours & Co., 125 F.3d 563, 567-68 (7th Cir. 1997) (quoting Heying v. Simonaitis, 466 N.E.2d, 1137, 1144 (Ill. 1984))**. It is no different as applied to Plaintiff's case. Accordingly, Defendants are entitled to summary judgment as to Count 5 of Plaintiff's

Amended Complaint.

**F.      Qualified Immunity**

Lastly, the Court must address whether the doctrine of qualified immunity serves to shield defendants Simpson, Crocker and Drew, as Board Trustees, from liability as to Counts 1, 2 and 3 of Plaintiff's Amended Complaint.[7] Typically, the doctrine of qualified immunity acts as a protective shield for "government officials against suits arising out of their exercise of discretionary functions 'so long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.' " *Jones v. Wilhelm*, **425 F.3d 455, 460 (7th Cir. 2005) (quoting** *Anderson v. Creighton*, **483 U.S. 635, 638 (1987))**. However, individual governmental officials officers "who act unreasonably or 'who knowingly violate the law'" are not entitled to use qualified immunity as a defense. *Sornberger v. City of Knoxville, Ill.*, **434 F.3d 1006, 1014 (7th Cir. 2006)(quoting** *Hunter v. Bryant*, **502 U.S. 224, 228 (1991))**.  Here, however, it is essentially unnecessary at this point for the Court to consider whether qualified immunity applies as Defendants were not found to have committed any constitutional violations.  *See Estate of Phillips, III v. City of Milwaukee*, **123 F.3d 586, 597 (7th Cir. 1997) (citing** *Kraushaar v. Flanigan*, **45 F.3d 1040, 1049 (7th Cir. 1995))**.

---

[7]  The doctrine does not apply to the College or to defendant Huffman, who was not serving in the capacity as a Board Trustee, but rather, as a private attorney.  *See Ulichny v. Merton Cmty. School Dist.*, **249 F.3d 686, 705 n.18 (7th Cir. 2001) (citation omitted)**.

## VI.  **Conclusion**

For the reasons discussed herein, the Court hereby **GRANTS** the Motion for Summary Judgment (Doc. 71) filed by defendants Board of Trustees of Rend Lake College, County of Jefferson, State of Illinois (the "College"), Bill Simpson, Randall Crocker and Bryan Drew, regarding Counts 1 through 5 of Plaintiff's Amended Complaint, and also **GRANTS** the Motion for Summary Judgment (Doc. 74) filed defendant John Huffman, as to Count 5.   (Plaintiff's Count 6 having previously been dismissed with prejudice.) As such, Counts 1 through 5 of Plaintiff's Amended Complaint (Doc. 37) should be **DISMISSED WITH PREJUDICE** as follows: Count 1 - summary judgment is granted in favor of defendant the College and against Plaintiff; Count 2 - summary judgment is granted in favor of defendants the College, Simpson, Crocker and Drew, and against Plaintiff; Count 3 - summary judgment is granted in favor of defendant the College and against Plaintiff; Count 4 - summary judgment is granted in favor of defendants Simpson, Crocker and Drew and against Plaintiff; and Count 5 - summary judgment is granted in favor of defendants the College, Simpson, Crocker, Drew and Huffman and against Plaintiff. Judgment shall be entered accordingly.

**IT IS SO ORDERED**

Signed this 8th day of February, 2010.

/s/    *David R. Herndon*

**Chief Judge**
**United States District Court**